UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ELIZABETH SOTO,

        Plaintiff,

     -against-

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
-------------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

15 CV 8207 (VEC) (KNF)

TO THE HONORABLE VALERIE E. CAPRONI, UNITED STATES DISTRICT JUDGE

     Elizabeth Soto ("Soto") commenced this action against the Commissioner of Social Security ("Commissioner"), seeking review of an administrative law judge's ("ALJ") decision, dated May 27, 2014, finding her ineligible for disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401, et seq., and supplemental security income ("SSI") benefits, pursuant to Title XVI of the SSA, 42 U.S.C. §§ 1381-1385. The ALJ's decision became final on August 13, 2015, when the Appeals Council denied Soto's request for review. This action followed. Before the Court is the Commissioner's motion for judgment on the pleadings, made pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The plaintiff, who is proceeding pro se, has not opposed the motion.

     An administrative hearing was held on April 25, 2014, before ALJ Mark Solomon, at which Soto, represented by counsel, testified. A vocational expert, Melissa Fass-Karlin ("Fass-Karlin"), also testified at the hearing.

     The issue before the ALJ was whether Soto is disabled. Following a review of the plaintiff's submissions and the record in this case, the ALJ determined that Soto: (1) meets the

1

insured status requirements of the SSA through December 31, 2016; (2) has not engaged in

substantial gainful activity since September 28, 2012, the date on which her alleged disability

began; (3) has severe physical impairments, namely, bilateral plantar fasciitis and triggering of

the right index finger;[1] (4) does not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1; (5) has the residual functional capacity to perform less than a full range

of light work; specifically, the ALJ found that the plaintiff can lift and carry up to twenty pounds

occasionally, stand or walk for about six hours and sit for about two hours, during an eight-hour

workday, and is limited to frequent handling and occasional fingering;[2] (6) is capable of

performing past relevant work as a day care worker; and (7) was not under a disability from

September 28, 2012, through the date of the decision, that is, May 27, 2014.

## BACKGROUND

Soto was born in September 1955. At her administrative hearing before the ALJ, Soto

testified that she graduated from high school and had worked for approximately thirty years as a

teacher's aide at a childcare facility. Soto testified that she had last worked in September 2012,

when she was laid off from her job. Soto stated that she collected unemployment insurance

benefits and looked for work for approximately one year. Soto testified that if she had not been

laid off from her job she would not have continued working, because she was having problems

with her hands and feet and was no longer able to lift the children or pick up their cots. In

response, the ALJ noted that, when applying for benefits, Soto stated that she was not required to

pick up more than ten pounds on a regular basis. Soto explained that she had been referring to

---

[1] The ALJ determined that the plaintiff's bilateral knee pain is not a severe impairment.

[2] See 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

materials, not children. Soto stated that she was able to travel on her own but had trouble climbing stairs. She reported that she has a cane, which she uses when her knee gives way. Soto stated that she lives with her mother, who is ninety-seven years old, and that her mother is independent.

Soto stated that she is able to take care of her own personal needs, such as dressing, grooming and showering, and that she does light cleaning. Soto testified that she is being treated for plantar fasciitis and carpal tunnel syndrome in the right hand and also has difficulty using her hands or fingers.

Soto testified that she can sit for an hour or less before her back starts hurting and that she can only stand for five or ten minutes because of pain in her feet; she goes grocery shopping once or twice a week, by herself, and carries her groceries, if they weigh no more than five pounds. Soto stated that she suffers from tennis elbow and migraines.

When questioned by her attorney concerning her ability to read and write, Soto stated that she has a fourth grade reading level; however, the ALJ noted that Soto has a high school diploma. Soto stated that her knees swell up when she stands or walks for long periods and that this condition began in 2013, after she lost her job. When asked whether she would have been able to work during the period she collected unemployment had she been offered a job, Soto stated that she did not know.

Vocational expert Fass-Karlin also testified at the hearing, via telephone. Fass-Karlin testified that the plaintiff's past work was classified in the Dictionary of Occupational Titles as a daycare worker, which is light, semi-skilled work. In response to questioning from the ALJ, the vocational expert noted that Soto had testified that, as part of her work, she lifted small children; consequently, she did not think Soto could perform the job as she had previously. However,

according to Fass-Karlin, the job as normally performed did not require such lifting. Fass-Karlin concluded that, with two restrictions, namely, frequent handling and occasional fingering, Soto was able to perform her past relevant work as a daycare worker.

### *Medical Evidence*

As noted above, the relevant period in this case is September 28, 2012, through May 27, 2014. During that period, Soto consulted, inter alia, Dr. Joyce Graber ("Dr. Graber"), a consultative examiner, and Dr. William King ("Dr. King"), her treating physician.

### Dr. Graber

On December 6, 2012, Dr. Graber performed an internal medicine examination of the plaintiff in connection with her application for disability benefits. Dr. Graber noted that the plaintiff reported that she: (i) has a history of plantar fasciitis for the past five to six years; (ii) has pain most days that is 10/10; (iii) has had carpal tunnel syndrome for the past five to six years; (iv) has had inflammation of her knees bilaterally for the past five to six years; (v) has lower back pain, due to her leg pain and knee pain; (vi) has loss of hearing bilaterally for the past three years; (vii) suffers from migraine headaches, and (viii) has had temporomandibular joint disorder ("TMJ") for six years. The plaintiff also reported to Dr. Graber that she was hospitalized in 2006 and 2007 for three surgeries on her trigger fingers, on both hands.

Regarding her daily living, the plaintiff told Dr. Graber that she lives with her mother, precooks food, does a limited amount of cleaning, laundry and shopping, dresses herself daily, watches television and listens to the radio. Following a physical examination of the plaintiff, Dr. Graber reported that the plaintiff was in no acute distress, had a normal gait and was able to walk on her heels and toes without difficulty. Dr. Graber found that the plaintiff was able to perform a full squat, although with pain, needed no help in getting on and off the examination table, and

was able to rise from a chair without difficulty. The plaintiff's only limitation in range of motion, according to Dr. Graber, involved her right knee which she was able to flex to 130 degrees (normal is 150 degrees). In other respects, the plaintiff had full range of motion through her spine and full strength (5 out of 5) bilaterally in the upper and lower extremities. Dr. Graber found that the plaintiff suffered from no sensory deficit, cyanosis, clubbing or edema, had normal pulses, no muscle atrophy, intact hand and finger dexterity and full grip strength.

Dr. Graber diagnosed plantar fasciitis, carpal tunnel syndrome, inflammation of the knees, lower back pain, hearing loss, migraine headaches and TMJ, all by history. Dr. Graber concluded that, based on her examination, the plaintiff had "no physical limitations."

Dr. King

The plaintiff began seeing Dr. King in 1995.[3] On that occasion, she saw Dr. King for tennis elbow and received an injection. On July 20, 2005, Dr. King diagnosed bilateral tennis elbow and carpal tunnel syndrome with trigger digits. Dr. King prescribed conservative treatment, including ibuprofen and night taping. The plaintiff returned on September 8, 2005; on that occasion, she had locking of her right ring finger and middle finger. Dr. King administered injections. On September 16, 2005, Dr. King performed surgery on the plaintiff's right hand for tenosynovitis and referred her for hand therapy in October 2005. By February 2006, the plaintiff was doing well; Dr. King prescribed a wrist brace at night. On March 15, 2006, the plaintiff was doing very well and therapy was discontinued.

The plaintiff saw Dr. King in November 2006 for symptoms of flexor tenosynovitis in her right thumb and left middle digit as well as epicondylitis of the right elbow. On March 16, 2007, Dr. King performed surgery on the plaintiff's left hand for tenosynovitis. Following a car

---

[3] Between 1995 and the start of the relevant period, that is, September 2012, the plaintiff saw Dr. King more than thirty times, on occasion several times a month.

accident in September 2007, the plaintiff had some pain and difficulty with her left hand, contusions and abrasions but no fractures. On January 17, 2008, Dr. King administered cortisone injections for bursitis and prescribed Indocin, ice and continued physical therapy.[4]

From June 2009 through September 2010, Dr. King treated the plaintiff for, among other things, plantar fasciitis, right carpal tunnel syndrome and bursitis of the right knee. In February 2011, Dr. King performed surgery on the plaintiff's left hand for tenosynovitis. On July 20, 2011, Dr. King noted that the plaintiff was having difficulty with her left ring finger after surgery and that she would receive injections for plantar fasciitis. Dr. King referred the plaintiff to a foot and ankle specialist and prescribed Vicoprofen.[5]

The plaintiff next saw Dr. King on September 26, 2013, one year after the alleged onset of her disability, in connection with triggering of her right index finger. On that occasion, she also complained of difficulty with her feet. Dr. King noted that, in July 2011, the plaintiff had been referred to a foot and ankle specialist and that since that time she had had progressive difficulty with her feet. He reported that a recent EMG/nerve conduction study of her lower extremities showed no neuropathy in her lower extremities and he advised that she see a foot and ankle specialist. Regarding her hands, Dr. King noted that she had had multiple surgeries and was unable to perform activities of daily living of any repetitive nature and that an injection in her right index finger one month earlier was unsuccessful. The plaintiff reportedly declined surgical intervention for carpal tunnel syndrome.

---

[4] During the period November 2008 through June 2009, the plaintiff consulted Dr. Craig Radnay ("Dr. Radnay") for treatment in connection with foot pain. In March 2009, Dr. Radnay diagnosed degenerative arthritis of the right knee and administered injections in both knees. In April 2009, the plaintiff had full range of motion and was neurovascularly intact.
[5] During the period October 2011 through May 2012, the plaintiff consulted Dr. Lise Vincent, a doctor of podiatric medicine for bilateral heel pain.

On October 9, 2013, Dr. King completed a medical report form in connection with the plaintiff's application for SSA disability benefits. Dr. King identified the following diagnoses: bilateral trigger digits, bilateral tennis elbow and bilateral carpal tunnel syndrome. He stated that all these conditions could be expected to last for at least twelve months. He reported that the plaintiff had neuropathy and that the prognosis was guarded, and that the plaintiff could sit for a total of five hours, stand for a total of four hours, and walk for a total of two hours in an eight-hour workday. He also reported that she could occasionally lift and carry up to 20 pounds, could bend, squat, climb and reach occasionally, and could perform simple grasping with both hands but could not perform tasks involving fine manipulation or pushing and pulling of arm or leg controls due to neuropathy. Dr. King noted that the plaintiff could tolerate moderate exposure to such environmental conditions as marked changes in temperature and exposure to dust, fumes and gases, as well as to stress, and was able to travel by bus and subway. When asked whether the plaintiff could engage in her previous work in child education, or any work, on a sustained, full-time basis, Dr. King indicated that she could not.

On April 10, 2014, Dr. King administered cortisone injections for bilateral plantar fasciitis and noted that the plaintiff had signs of bilateral tarsal tunnel syndrome with positive Tinel's sign in both feet and that her right knee continued to cause problems. He noted that she was developing flexor tenosynovitis of the right index and middle fingers, for which he prescribed taping and Indocin.

Dr. King completed a second medical report form on April 14, 2014. On that date, Dr. King added the diagnoses of bilateral tarsal tunnel syndrome and plantar fasciitis and noted that the plaintiff had difficulty with stairs in the subway; his findings were otherwise the same as those noted in October 2013.

7

***Defendant's Contentions***

The Commissioner contends that the ALJ found, correctly, that Soto was not disabled from September 28, 2012, the date on which she alleged she became disabled, through May 27, 2014, the date of the ALJ's decision. According to the Commissioner, the ALJ's decision, finding the plaintiff not disabled during the relevant period, is well supported by the substantial evidence in the record.

The Commissioner contends that the record shows that the plaintiff's bilateral knee pain was not a severe impairment and that the totality of the medical and other evidence supports the propriety of the determination respecting the plaintiff's residual functional capacity. The Commissioner also contends that the ALJ concluded, properly, that the opinion of the plaintiff's treating physician, Dr. King, was not entitled to controlling weight.

## DISCUSSION

***Legal Standard***

"After the pleadings are closed - but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted). "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the [Social Security Administration's] regulations." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Social Security Administration's regulations establish a five-step process for determining a disability claim. See 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." At step two, the [Social Security Administration] will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the [Social Security Administration] assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the [Social Security Administration] to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) (internal citations omitted).

"Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Melville, 198 F.3d at 51. The Social Security Administration's regulations require that the ALJ develop the claimant's complete medical history and "make every reasonable effort" to assist the claimant in obtaining medical records. 20 C.F.R. §§ 404.1512(d), 416.912(d).

An "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. § 404.1508. To be severe, an impairment must have more than a minimal effect on an individual's ability to work and last or be expected to last for a continuous period of at least 12 months. See 20 C.F.R. §§ 404.1505(a), 416.905(a). "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

"According to [the treating physician] rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d. Cir. 2008) (citations and internal quotation marks omitted).

"The opinion of the treating physician 'is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.'" Petrie v. Astrue, 412 Fed. Appx. 401, 405 (2d Cir. 2011) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)).

10

When a treating physician's opinion is not given controlling weight, the regulations require an ALJ to consider several factors in determining how much weight it should receive; these include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence, particularly medical signs, laboratory findings and supporting opinions; (4) the consistency of the opinion with the record as a whole; and (5) whether the physician is a specialist in the area covering the particular medical issues. See Burgess, 537 F.3d at 129; 20 C.F.R. § 404.1527(c). "After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." Burgess, 537 F.3d at 129 (citations and internal quotation marks omitted).

"Although the claimant bears the general burden of proving that he is disabled under the statute, 'if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.'" Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). Ordinarily, the Commissioner's burden is met "by resorting to the applicable medical vocational guidelines." Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (citation omitted). In considering work which exists in the national economy, the ALJ "will decide whether to use a vocational expert or other specialist." 20 C.F.R. §§ 404.1566(e); 416.966(e).

### *Application of Legal Standard*

Upon review of the record, the Court finds that the ALJ followed the five-step sequential analysis properly when making the disability determination in this case and committed no legal error. The Court also finds that the ALJ's findings are supported by substantial evidence.

Bilateral Knee Pain

At step three of his analysis, the ALJ determined that Soto's bilateral knee pain is not a "medically determinable impairment at this time." The ALJ did not make citation to a medical source in support of this conclusion. However, the ALJ's finding that the plaintiff's bilateral knee pain is not severe is well supported by the medical evidence in this case.

As noted earlier, to be severe, an impairment must have more than a minimal effect on an individual's ability to work and must last or be expected to last for a continuous period of at least twelve months. See 20 C.F.R. §§ 404.1505(a), 416.905(a). According to the finding of the consultative examiner, Dr. Graber, the plaintiff's only range of motion limitation involved her right knee, which she was able to flex up to 130 degrees; nevertheless, Dr. Graber found that the plaintiff had no physical limitations. In addition, when the plaintiff saw Dr. King in September 2013, she made no mention of knee pain and, upon her return visit to Dr. King in April 2014, while knee problems were noted, no treatment was prescribed. Therefore, the ALJ found, properly, that the plaintiff's bilateral knee pain was not severe.

Determination of Residual Functional Capacity

In determining a claimant's residual functional capacity, the ALJ must make a decision based on all the relevant evidence, including a claimant's medical records, as well as the claimant's descriptions and observations respecting his or her limitations from any impairments, including limitations that result from symptoms such as pain. See 20 C.F.R. § 404.1545. In this case, the ALJ considered the relevant evidence in the record and concluded, properly, that the plaintiff could perform light work with certain limitations. As set forth in his decision, the ALJ's determination in this regard was based on his finding that: (i) the plaintiff's treatment records indicate only mild limitations; (ii) limited medical evidence exists in the record for the relevant

period; and (iii) significant inconsistencies exist between the plaintiff's allegations and the evidence in the record.

According to the ALJ, the plaintiff's "treatment records are replete with objective medical evidence documenting only mild physical limitations." As noted by the ALJ, Dr. King stated in September 2013 that "a recent nerve conduction study of her lower extremities does not note any neuropathy in her lower extremities." Additionally, according to the ALJ, Dr. King stated in April 2014 that "the claimant could sit for five hours, stand for four hours, and walk for two hours in an eight-hour workday." Further, "[t]he claimant stated that her condition has worsened due to her knee pain but did not see Dr. King from July 2011 to September 2013 and did not complain of knee pain to Dr. King until April [2]014." Furthermore, the ALJ noted, Dr. Graber, the consultative examiner, "stated in December 2012 that the plaintiff does not have any limitations." Thus, the plaintiff's treatment records suggest only mild limitations consistent with the determination that the plaintiff has the residual functional capacity to perform light work with limitations.

The ALJ also noted that the "limited medical evidence in the record" supports his finding that the plaintiff is not disabled and has the above-noted residual functional capacity. According to the ALJ, "there is very limited medical evidence in file post A[lleged] O[nset] D[ate] other than two visits with Dr. King." Additionally, according to the ALJ, a review of the record indicates that although Dr. King saw the plaintiff over a period of years prior to the relevant period, "there is no significant longitudinal history between the year prior to the alleged onset date and nearly one year after."

Further, according to the ALJ, there are significant inconsistencies between the claimant's allegations and the record evidence. Thus, "Dr. King stated in September 2013 that 'a

13

recent nerve conduction study of her lower extremities do not note any neuropathy in her lower extremities' . . . yet Dr. King found limits on using the claimant's legs and feet due to neuropathy." In addition, while the plaintiff "testified that her knees got worse six months ago and she was unable to lift up the kids, pick up tables and cots, which is necessary in performing her job as a daycare worker, [t]his is contrary to her disability report . . . completed in October 2012 indicating she generally did not lift anything more than 5 lbs. and 10 lbs. was the heaviest weight she lifted." Moreover, "the claimant testified that she stopped work because she was laid off, but she specified that it was not related to her physical condition." Thus, Soto applied for and collected unemployment insurance for one year, after she was laid off from her position as a daycare worker in September 2012, and continued to look for work in her field during that period. Hence, Soto's claim that she was disabled starting in September 2012 conflicts with her testimony and the record evidence. Therefore, the ALJ's finding concerning Soto's residual functional capacity is supported by substantial evidence.

Treating Physician Rule

The ALJ concluded, properly, that the opinion of the plaintiff's treating physician was not entitled to controlling weight. As set forth in his decision, the ALJ gave limited weight to the medical opinion of Dr. King based on the infrequency and paucity of treatment he provided to the plaintiff during the relevant period. Thus, as noted above, the plaintiff did not see Dr. King during the period from July 2011, more than one year prior to the alleged onset date, until September 2013, one year after that date. Consequently, as the ALJ observes, there is "no significant longitudinal history" of medical visits during that period. Additionally, Dr. King's opinion, as set forth in the medical report prepared in October 2013, that the plaintiff had neuropathy and that the prognosis was guarded, was not consistent with the result, reported in

14

September 2013, that a nerve conduction study of the plaintiff's lower extremities showed no neuropathy in the lower extremities. Moreover, Dr. King's finding that the plaintiff could not engage in her previous work in child education, or any work, on a sustained full-time basis, is a decision reserved to the Commissioner. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (stating that the "ultimate finding of whether a claimant is disabled and cannot work [is] 'reserved to the Commissioner'") (quoting 20 C.F.R. § 404.1527 (e)(1)).

Further, the ALJ considered, properly, the factors pertinent to determining how much weight a treating physician's opinion should receive, including the length of Soto's relationship with Dr. King, the frequency of his examinations, relevant evidence supporting his opinion and the consistency of the opinion with the record as a whole.

## RECOMMENDATION

For the reasons set forth above, I recommend that the Commissioner's decision be affirmed and the defendant's motion for judgment on the pleadings, Docket Entry No. 10, be granted.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni, 40 Centre Street, Room 240, New York, New York, 10007, and to the chambers of the undersigned, 40 Centre Street, Room 425, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Caproni.

*Failure to file objections within fourteen (14) days will result in a waiver of objections and will*

15

*preclude appellate review.* See Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v.

Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York
August 16, 2016                                    Respectfully submitted,

                                            KEVIN NATHANIEL FOX
                                            UNITED STATES MAGISTRATE JUDGE

16